SOL LUIS DESCARTES, TREASURER OF PUERTO RICO, Petitioner, v. TAX COURT OF PUERTO RICO, Respondent; B. SUÁREZ, INC., Intervener.

No. 290. Argued December 9, 1952.—Decided January 13, 1953.

---

J. B. *Fernández Badillo, Acting Attorney General,* and *Arnaldo P. Cabrera, Assistant Attorney General,* for petitioner. *F. L. San Miguel,* for intervener, petitioner in the main action.

MR. JUSTICE ORTIZ delivered the opinion of the Court.

In the former Tax Court of Puerto Rico the taxpayer and intervener herein, B. Suárez, Inc., filed a complaint against the Treasurer of Puerto Rico requesting him to set aside a property tax which was notified to the taxpayer on July 18, 1950, which amounted to the sum of $1,801.78. The tax was imposed on certain tobacco piles in the possession of the taxpayer on January 15, 1950. After the Treasurer answered and the case was heard, the Tax Court finally decided that on January 15, 1950, the tobacco in question was exempted from the payment of a property tax because it was raw material under the provisions of Act No. 61 of May 5, 1945 (Sess. Laws, p. 220) and that the retroactive application to said tobacco of Act No. 30 of March 30, 1950 (Sess. Laws, p. 86) for the purpose of levying a tax was unconstitutional and void. The Treasurer has filed a petition for certiorari in this Court, pursuant to the proceedings previously in force regarding this kind of cases.

According to the evidence introduced before the court *a quo* and to the findings by the latter, the background of the tobacco in question, as regards the process of stemming and sale, may be summarized as follows:

The tobacco in question was submitted to the same process employed in all the tobacco produced in Puerto Rico.

After the tobacco is harvested, the cropper sells it to the stemming concerns and then the tobacco is put in bulks or piles for fermentation. During fermentation, and in order to obtain the best quality of tobacco, an adequate inspection is required while the tobacco is submitted to controlled conditions of temperature, for about three months. Finally the stemming begins on June and July of each year, when the tobacco has already been "cured" and stacked with its leaves and "stems." Then moisture is added to the tobacco by the use of "sprays" or hose pipes and then placed on metallic "frames" so that it "drips" off the water. Once moistened, its temperature again rises, and they are placed and replaced in bundles about three or five times in order to soften the tobacco. After it has been dried in metal sticks which are submitted to artificial heat it is taken to the stemmers. The latter removes about two-thirds of the stem from the leaf and then puts the tobacco in packages or bundles, which are gathered and placed in boxes and carried to the packing department, where the packers sort the leaves according to the different types of tobacco. After the bundles are made they are mechanically pressed and sewn. While the tobacco is in the packing department, the purchasers from the United States examine the bundles and then make sale contracts with the stemmeries. The tobacco is then fumigated with carbon bisulfate and sent to whatever dock the purchaser indicates.

In the case herein, the taxpayer executed on June 20, 1949 a tobacco sales contract with the Consolidated Cigar Corporation, the latter binding itself to buy the tobacco to be finally stemmed and which belonged to the taxpayer, at a price per pound stipulated in the contract. The taxpayer and vendor was bound to pack and stem the tobacco. The effectiveness of the sale was subject to a subsequent examination of the stemmed tobacco by representatives of the purchaser before it was sent to the docks to be shipped, with a view to accepting the quality of the tobacco. The prices

were to be paid per pound upon each shipment finally accepted by the purchaser. The sales contract provided that the prices already stipulated were fixed and "free from any change whatsoever whether it meant an increase or decrease in the expenses or in the costs of handling the tobacco which might be incurred for any reason or cause."

The stemming of the tobacco involved in the case at bar began on July 1949 and continued until February 1950. On January 15, 1950 there was still enough tobacco in the stemming process, however on March 30, 1950 no tobacco remained in the taxpayer's establishment.

Act No. 61 of May 5, 1945 purported to exempt from the payment of taxes certain raw materials needed for manufacturing articles. Said Act provided as follows:

"Section 1.—For the purpose of this Act, by 'raw material' shall be understood not only products in their natural form derived from agriculture or from the so-called extractive industries, but any by-product, any semi-manufactured product, or any finished product, provided the same is used either as an ingredient in the manufacture of another industrial product or as an accessory or integral part of said other industrial product.

"Section 2.—By 'finished product' shall be understood that article for commerce which is obtained by combining two or more raw materials or submitting one or more of them to industrial processes, provided that in one or the other case predetermined methods are used and labor is used directly or indirectly.

"Section 3.—The 'raw material' that can be guaranteed to be destined for the production of finished articles, shall be exempt from the payment of property taxes while it remains in possession of its producer, of the importer into Puerto Rico, of the producer of the finished article, or of any intermediate distributor who may have it for sale or delivery to a producer of finished articles in the manufacture of which this raw material enters.

"Section 4.—The Treasurer of Puerto Rico shall provide, through rules and regulations to be promulgated for the purpose, the necessary measures for carrying out this Act, and he may demand of the taxpayers the presentation of any evidence

which might be necessary for the purpose. The Treasurer of Puerto Rico shall also have power to make the general regulations necessary for the enforcement of this Act in everything not inconsistent with the provisions hereof.

"Section 5.—All laws or parts of laws in conflict herewith are hereby repealed.

"Section 6.—This Act shall take effect July 1, 1945."

The tobacco in question was exempted from the payment of taxes prior to January 15, 1950 inasmuch as it was "raw material" under the provisions of the aforementioned Act. No. 61 of 1945. The stemmed tobacco constituted a "finished" product," since it is obtained after submitting the raw tobacco to an industrial process, using predetermined methods; and applying labor in direct or indirect form for the purpose; of producing the stemmed tobacco. The very Act No. 61 of 1945 provided that the "finished product" constituted "raw material" exempted from the payment of a property tax while it was in the possession of the producer, that is, of its stemmer. Although on January 15, 1950, the tobacco was not totally stemmed, yet, it was partially processed. According to Act No. 61 of 1945 a semi-manufactured product also constitutes raw material exempted from the payment of taxes.

In *P. Lorrilard Co.* v. *Ross*, 209 S. W. 39, the taxpayer stemmed tobacco in Kentucky and then sent it to his own factories located in other states, where it was manufactured into cigarettes, cigars and chewing tobacco. A state law of Kentucky provided that the products in the course of manufacture of persons, firms or corporations, actually engaged in manufacturing would be exempted from taxation and that the raw material actually on hand at their plants would also be exempted from taxation as long as said raw material was used for the purpose of manufacture. It was held that in view that the final products (cigarettes and cigars) were not manufactured in Kentucky, that is in the place where the exemption was requested, the stemmed tobacco was not

exempted under the afore-mentioned Act. From said Act of Kentucky it appeared that the legislative intent was to the effect that the exemption be granted only if the final product was manufactured in Kentucky. Said intention does not appear from Act No. 61 of 1945. What is required is that the raw material be used as ingredient in the manufacture of another industrial product or as an accessory or integral part of said other product. The raw material was exempted while it was in the possession of the producer. It is not stated in the law, nor inferred therefrom, that the final industrial product was manufactured in Puerto Rico. If the legislative intent would have been exclusively that of stimulating the manufacture of cigarettes, cigars, or other final products in Puerto Rico, then there would have been a margin for the construction adopted by the Supreme Court of Kentucky in the afore-cited cases. However, the legislative intent could very well have been that of stimulating the production of raw material in Puerto Rico for the purpose of exporting it to be used in subsequent manufacturing processes in other places.

We must, therefore, reach the conclusion that, prior to January 15, 1950, the tobacco in question was exempted from the property tax. However, on March 30, 1950, Act No. 30 which provides as follows, was approved:

"Section 1.—Section 1 of Act No. 61, approved May 5, 1945, is hereby amended to read as follows:

"Section 1.—For the purposes of this Act, by 'raw material' shall be understood not only products in their natural form derived from agriculture or from the so-called extractive industries, but any by-product, any semi-manufactured product, or any finished product, provided the same is used either as an ingredient or an integral part of another industrial product, so that when the industrial process is carried out, said raw material shall come wholly and completely to form a part of the finished product, or shall be completely consumed, be wholly extinguished, and cease to exist.

"Section 2.—Section 3 of said Act No. 61, approved May 5, 1945, is hereby amended to read as follows:

"Section 3.—The raw material that can be guaranteed to be destined for the production of finished articles, shall be exempt from the payment of property taxes while it remains in the possession of the producer of the finished article.

"Section 3.—This Act, being of an urgent character, shall take effect immediately after its approval, but the provisions hereof shall have retroactive effect to January 1, 1950."

When Bill 365 of the House of Representatives of Puerto Rico was approved, becoming later the aforesaid Act No. 30 of March, 1950, the following took place:

"It is stated:

"First: That Bill No. 365 was the object of the following explanation in Full Commission:

"Mr. Ortiz: Act No. 61 of May 5, 1945 is drafted in such general terms that should its text be literally applied by our courts a great part of the present tax on personal property would be lost. An example of this statement is the recent decision of our Tax Court in the *J. R. Nieves* v. *Treasurer (P. 702 T. C.,* decided on November 10 1949), in which the casks for the aging of rum are tax exempted inasmuch as they are considered raw material according to the definition of this concept in said Act. The tax to be returned, reimbursed, or credited according to the aforesaid decision amounts, pursuant to a study made, to more than $50,000.

"Pursuant to the text of the Act the list of products or materials which would be exempted from a property tax would be endless, but we shall only name some in order to give a rough idea of what this may mean in the future:

"1. Sugar for the production of candy, pastry, ice cream factories, etc.

"2. Sugar exported to the United States for its refining or to be made into other products.

"3. Fruits and other substances to be canned, to be made into syrups for soda fountains, etc.

"4. Products for the manufacturing of furniture.

"5. Construction materials.

"6. Raw material for ready-made clothing and sewing factories.

"7. Cement and other substances for the manufacturing of blocks, tiles and clay products, etc.'

"8. Materials for melting of metals, accessories for finished parts, etc.

"9. Material for printing presses.

"10. Drugs and substances for the manufacturing of medicines, perfumes, etc.

"Furthermore, we have to consider that the products or materials which are tax exempt by this Act, are so not only when they are in the hands of the manufacturer of the finished product, but also when they are in the possession of any middle man, with the only limitation that *'it may be guaranteed that they are destined to finished articles.'* By means of these contracts with manufacturers of finished articles, any merchant could exempt from tax the majority of his goods.

"The amendments suggested for this Act are directed to block slightly this wide loophole but always maintaining the legislative intent of promoting industry.

"Section 1 which describes in a sweeping language what is raw material, intends to amend it in two aspects:

"*a.* To eliminate the phrase 'or as an accessory' for said description could include all the property of a factory. The phrases: 'as an ingredient' or 'as an integral part,' would remain in the Act.

"*b.* To add the provision that in order that the product or material may be exempted it must disappear or be consumed becoming an integral part of the finished product. The idea is to exclude casks and other machinery or accessories."

The afore-cited Act No. 30 of March 30, 1950 limits the tax exemption to the raw material in possession of the producer of the finished product, that is, in this case of the producer of cigars and cigarettes. The previous Act, No. 61 of 1945, extended the exemption to the raw material in possession of its producer, that is, of the taxpayer in this case. Undoubtedly, Act No. 30 of 1950, eliminated the tax exemption enjoyed by the tobacco in question prior to January 1, 1950. However, the Tax Court decided that the retroactive application of Act No. 30, 1950 to the taxpayer's tobacco in stock on January 15, 1950 was unconstitutional. That is, precisely, the essential problem herein.

 Generally, an Act which imposes taxes retroactively is not void *per se*, that is, that the fact itself that it is retroactive does not necessarily imply its unconstitutionality. *Buscaglia, Treas.* v. *Tax Court,* 70 P.R.R. 432; *Welch* v. *Henry,* 305 U. S. 134; Paul, *Studies in Federal Taxation,* 3d Series, p. 442. The tax laws are not necessarily void unless they affect vested rights or deprive a taxpayer of his property without due process of law. 51 Am. Jur. 143, § 109; *Kentucky Union Co.* v. *Kentucky,* 219 U. S. 140, 152. A tax does not violate, necessarily, the clause of due process of law because it is retroactive. In each specific case it is necessary to consider the nature of the tax and the circumstances in which it is levied before it can be said that its retroactive application is so harsh and oppressive as to transgress the constitutional limitation. *Buscaglia, Treas.* v. *Tax Court, supra; Welch* v. *Henry, supra.* [1] The fact itself that a tax is levied implies that the taxpayer loses part of his property or of his economic resources. Naturally, said deprivation does not entail the unconstitutionality of the tax inasmuch as the taxpayer obtains a *"quid pro quo,"* that is, he loses part of his property but in return the state grants him different benefits and opportunities and guarantees him the state protection. The test of whether a tax law violates the due process clause is whether it bears some fiscal relation to the protection, opportunities and benefits given by the state, or, in other words, whether the state has given anything for which it can ask a return from the citizen. *Cleveland-Cliffs Iron Co.* v. *State of Michigan,* 45 N. W. 2d 46; *Morton Salt Co.* v. *City of South Hutchinson,* 159 F. 2d 897. Just as it was stated in *Welch* v. *Henry, supra,* at page 146:

"Taxation is neither a penalty imposed on the taxpayer nor a liability which he assumes by contract. It is but a way of apportioning the cost of government among those who in some

---

[1] As a matter of fact no state law on property tax has been declared unconstitutional only because it has been made retroactive. *"Retroactive Federal Taxation",* 48 Harv. L. Rev. 592, 595, n. 17.

measure are privileged to enjoy its benefits and must bear its burdens. Since no citizen enjoys immunity from that burden, its retroactive imposition does not necessarily infringe due process . . ."

It is true that the state protection and the benefits obtained under the protection of a government of laws are intangible and can not be measured in a concrete and specific way. But that implies, precisely, that the content and scope of the constitutional due process clause are elastic and fluid and can not be measured or defined with precision. The "due process" is not a term of fixed and invariable content, (*Communications Comm'n* v. *W.J.R.*, 337 U. S. 265, 275), and it is not susceptible of reduction to a mathematical formula, (*Gibbs* v. *Burke*, 337 U. S. 773). Due process of law conveys neither formal nor fixed nor narrow requirements, and the true problem involved as to the application of said clause does not require that an absolute line be drawn at any point but it does imply that the courts must draw their limitations and boundaries by the gradual and empiric process of inclusion and exclusion. *Wolf* v. *Colorado*, 338 U. S. 25. The due process required by the Constitution has reference to a standard of process that may cover many varieties of processes that are expressive of differing combinations of historical or modern, local, juridical, social or economical standards provided they do not conflict with the fundamental principles of liberty and justice. *Bute* v. *Illinois*, 333 U. S. 640. The due process of law required by the Constitution is a concept of fundamental justice which is less rigid and more fluid than those envisaged in other specific provisions of the Constitution and its possible violation must be proved not by way of general rules but by an appraisal of the totality of facts involved in each specific case. *Betts* v. *Brady*, 316 U. S. 455; *Foster* v. *Illinois*, 332 U. S. 134. The guaranty of a due process of law solely demands that the law shall not be unreasonable, arbitrary or capricious, and that the means selected shall have a real

and substantial relation to the object sought to be attained. *Nebbia* v. *New York*, 291 U. S. 502.

 Applying these realistic and fluid standards to the problem before us the rule that a retroactive tax may be legitimately related to the guaranteed state protection and to the benefits and privileges enjoyed in the past [2] may be validly applied. Naturally, there are limitations as to the constitutionality of a retroactive tax. At the outset, the tax must not be too remote inasmuch as should it be so, the relation between the benefit and the burden loses significance. Besides, the tax must not be arbitrary, capricious or obviously unfair and oppressive in such a way that it results in an evident inequality between the social benefits and the tax burdens. *Morton Salt Co.* v. *City of South Hutchinson, supra; Missouri Pac. R. R.* v. *Road District*, 266 U. S. 187. A retroactive tax which is confiscatory or which is equivalent to a deprivation or results in an obvious inequality or injustice is unconstitutional. *Ballester v. Descartes*, 181 F. 2d 823. *South Porto Rico Sugar Co.* v. *Buscaglia*, 154 F. 2d 96. Neither can a retroactive tax validly affect vested rights through definite and irrevocable actions which antedate the approval of the act which established the retroactive tax. *Welch* v. *Henry, supra*, at p. 147. Another operative test refers to the fact of whether the nature or amount of the tax could or could not be reasonably anticipated by the tax-

---

[2] In a dissenting opinion delivered in *Untermeyer* v. *Anderson*, 276 U. S. 440, 446, Justice Holmes stated the following:

"A tax may be levied for past privileges and protection as well as for those to come."

In another dissenting opinion of Justice Brandeis, in that same case, the following was stated:

"The need of the Government for revenue has hitherto been deemed a sufficient justification for making a tax measure retroactive whenever the imposition seemed consonant with justice and the conditions were not such as would ordinarily involve hardship."

We are not citing dissenting opinions as authorities with regard to the specific merits of this case but we do believe that those pronouncements of the two eminent dissenting Justices have an undeniable social and logic value.

payer at the time that he performed the specific voluntary act which the law subsequently made a taxable event. *Buscaglia, Treas.* v. *Tax Court, supra,* at p. 459; *Welch* v. *Henry, supra,* at p. 147; *Nichols* v. *Coolidge,* 274 U. S. 531. In *Nichols* v. *Coolidge, supra,* the taxpayer had made an absolute gift before the retroactive tax was imposed and at the time of the gift she could not reasonably anticipate that an Act would be subsequently approved taxing said gift. The donor could have decided not to make it if he would have known that later on the tax would be imposed. Under these circumstances, it was considered that the retroactive tax was so arbitrary and oppressive that it constituted a denial of due process of law. However in *Milliken* v. *United States,* 283 U. S. 15, 21, a retroactive tax on gifts was declared valid inasmuch as the statutes antedating the gift, although not imposing the exact tax imposed in that case, implied however a reasonable notice that the specific tax could be levied in the future. Briefly, if the retroactiveness in the tax bears a situation of fundamental injustice said retroactiveness should be declared unconstitutional.

In *Ballester* v. *Court of Tax Appeals,* 61 P.R.R. 460, 484, it is held that Act No. 31 of 1941 (Sess. Laws, p. 478), which amended various Sections of the Income Tax Act, could be validly applied retroactively to January 1, 1940, even increasing the tax rates, without violating the due process of law.

In the case at bar our Legislative Assembly repealed an exemption retroactively. Generally, an exemption is equivalent to a bonus or subsidy. *Grand Lodge* v. *New Orleans,* 166 U. S. 143; *West Wisconsin R. R. Co.* v. *Supervisors,* 93 U. S. 595; 51 Am. Jur. 537, 538, § 536; Taxes, *The Tax Magazine,* "Tax Exemptions to Encourage Industry", Vol. 29, p. 383. Naturally, if from the very statute creating the exemption a legislative promise of maintaining said exemption appears, it would be equivalent to a contractual obligation and the exemption could not be repealed. How-

ever, in the case at bar said contract or legislative promise does not appear from Act No. 61, of 1945 which establishes the exemption involved herein, and therefore, it may be repealed.

What has been previously set forth is sufficient to show that the taxpayer herein did not have a vested right to the exemption. The retroactiveness in repealing the exemption is not arbitrary nor does it impair any fundamental rule of justice whatsoever. The taxpayer was bound to know the juridical nature of the exemption, insofar as it did not create any irrevocable right whatsoever and the taxpayer ought to have reasonably anticipated that the exemption could have been repealed at any moment. The taxpayer assumed the risk of any act on its part on the basis of a tax exemption which of itself was uncertain and unstable.

It is alleged in the case at bar that the taxpayer made a compulsory tobacco sales contract in June 1949 and that had it known that the exemption would be repealed, the selling price would have been higher and that therefore, the retroactive application of the exemption is unfair and arbitrary. We have already stated that the taxpayer should have reasonably anticipated that the exemption could be repealed at any moment. Besides, the tax was not levied on the sale itself of the tobacco but on the tobacco as a property.

The retroactiveness in this case did not refer to a period of time which was too remote. Act No. 30 of 1950 was approved on March 30 of that same year and made retroactive to January 1 of that same year. That period of time is not unreasonable. It is evident that the Act was made retroactive to said date for the purpose that it be applicable to the fiscal year of 1950–51 inasmuch as January 15 of each year is the date of the taxable status of the property in connection with the next fiscal year. *Buscaglia, Treas.* v.

*Tax Court,* 68 P.R.R. 34, 35 and cases cited therein. It was therefore, a case of administrative convenience as to the collection of taxes.

Inasmuch as the retroactive application of Act No. 30 of 1950 was not arbitrary or unfair, the Treasurer acted correctly in collecting the tax herein, and the former Tax Court erred in holding that said retroactive application of the afore-cited Act was unconstitutional.

The decision appealed from must be reversed and another rendered instead dismissing complaint.